# Exhibit F

(Part 4 of 4)

| | |
|---|---|
| **District Court, Arapahoe County, Colorado**<br>7325 South Potomac Street<br>Centennial, Colorado 80112 | |
| | DATE FILED: July 18, 2014 3:14 PM<br>FILING ID: 8B201AB0B0CF0<br>CASE NUMBER: 2014CV31946 |
| **Plaintiff:** | |
| **SANDY PHILLIPS**, individually and as surviving parent of Jessica Ghawi, decedent; **LONNIE PHILLIPS**, individually and as surviving parent of Jessica Ghawi, decedent; and on behalf of All Others Similarly Situated. | |
| v. | |
| **Defendants:** | |
| **LUCKY GUNNER, d/b/a/ BULKAMMO.COM**, a Georgia Corporation,<br>**THE SPORTSMAN'S GUIDE**, a Minnesota Corporation,<br>**Brian Platt, d/b/a/ BTP ARMS**,<br>**Gold Strike E Commerce LLC d/b/a/ BULLETPROOFBODYARMORHQ.COM**, an Arizona Corporation;<br>**JAMES HOLMES**, an individual;<br>and **JOHN DOES 1 through 10**, unknown individuals. | |
| **Attorneys for Plaintiffs:** | ▲ COURT USE ONLY ▲ |
| Thomas W. Stoever, Jr., Attorney No. 25434<br>Paul W. Rodney, Attorney No. 41951<br>ARNOLD & PORTER LLP<br>370 Seventeenth Street, Suite 4400<br>Denver, CO 80202<br>Phone Number: (303) 863-1000<br>E-mail: Thomas.Stoever@aporter.com<br>E-mail: Paul.Rodney@aporter.com<br><br>Jonathan Lowy<br>Elizabeth Burke<br>Kelly Sampson<br>The Brady Center to Prevent Gun Violence<br>840 First Street, NE, Suite 400<br>Washington, DC 20002<br>*Pro Hac Vice Admission Pending* | Case No.:<br><br>Ctrm: |
| **COMPLAINT** | |

Plaintiffs Sandy Phillips and Lonnie Phillips, each individually and on behalf of all others similarly situated ("Plaintiffs"), respectfully complain as follows against Defendants Lucky Gunner d/b/a BulkAmmo.com, The Sportsman's Guide, Brian Platt, d/b/a/ BTP Arms, Gold Strike E Commerce LLC, d/b/a/ BulletProofBodyArmorHQ.com, John Does 1-10, and James Holmes ("Defendants").

## INTRODUCTION

1.     This is a civil action stemming from an armed attack on unsuspecting moviegoers at the Aurora Century 16 movie theater in Aurora, Colorado on July 20, 2012, which left 12 dead and at least 58 injured, after the Defendants Lucky Gunner d/b/a/ BulkAmmo.com, The Sportsman's Guide, Brian Platt, d/b/a/ BTP Arms, Gold Strike E Commerce LLC, d/b/a/ BulletProofBodyArmorHQ.com Corp., John Does, and James Holmes (collectively, "Defendants") negligently and unlawfully supplied a patently dangerous homicidal man, Defendant James Holmes, with the equipment necessary for him to engage in a mass, offensive assault on innocent people.

2.     Defendants sell combat supplies, such as military-style high capacity ammunition magazines, ammunition and body armor, that can be and have been used in numerous criminal shootings, including horrific mass attacks on humanity. At all relevant times they were well aware of the foreseeable risk that their products would be used in such attacks, especially if they failed to exercise reasonable care in their business practices.

3.     It was highly foreseeable to Defendants that their potential customers included persons with criminal intent, including persons such as James Holmes, who was bent on committing a mass assault.

4.     In fact, in the months leading up to the attack, James Holmes engaged in a pattern of bizarre behavior. He acted, looked, and expressed himself in a way that raised grave suspicions about his dangerousness and mental stability, so much so that during the same time period that the Defendants sold Holmes thousands of rounds of ammunition and other combat supplies, a local shooting club did not admit Holmes because his behavior was so disturbing and suspicious.

5.     Defendants Lucky Gunner d/b/a/ BulkAmmo.com, The Sportsman's Guide, Brian Platt, d/b/a/ BTP Arms, and Gold Strike E Commerce LLC, d/b/a/ BulletProofBodyArmorHQ.com established and operated businesses which attracted -- and catered to -- dangerous persons such as Holmes, and yet they failed to implement any reasonable safeguards to prevent dangerous people from obtaining high-capacity ammunition magazines, thousands of rounds of ammunition, body armor, and tear gas, and by which Holmes, and dangerous people like him, could buy such materiel online, without any human interaction or screening. Defendants failed to reasonably screen to prevent such dangerous people from obtaining arms. They negligently and unlawfully sold James Holmes thousands of rounds of ammunition, high capacity magazines, body armor, and tear gas despite indicia that Holmes would use the materiel for unlawful purposes.

2

6.     This lawsuit does not in any way challenge the right of law-abiding citizens to bear arms. This lawsuit also does not challenge in any way the right of responsible businesses to operate a business of selling products -- even potentially lethal products -- to law-abiding citizens. This lawsuit is about the unreasonably dangerous operation of businesses that negligently supply combat supplies and other materiel to the criminal market. Negligently supplying dangerous people with the means to engage in mass killings not only causes foreseeable harm (such as the shooting incidents underlying this case), it unfairly tarnishes the right of all law abiding citizens to bear arms for lawful purposes, including protection, hunting, or other recreational activities.

7.     As a direct result of Defendants' negligence, 12 people were shot and killed and at least 58 were injured.

## PARTIES

8.     Plaintiff Sandra Phillips, is a natural person and citizen of the State of Texas, who presently resides at 2906 Whisper View, San Antonio, TX 78230.  She brings this claim individually as heir to Jessica Ghawi, decedent and as the surviving parent of Jessica Ghawi, decedent, who was a resident of the State of Colorado.

9.     Plaintiff Lonnie Phillips is a natural person and citizen of the State of Texas, who presently resides at 2906 Whisper View, San Antonio, TX 78230.  He brings this claim individually as heir to Jessica Ghawi, decedent and as the surviving parent of Jessica Ghawi, decedent, who was a resident of the State of Colorado.

10.     Defendant Lucky Gunner (hereinafter referred to as "BulkAmmo.com") is a Tennessee entity doing business as BulkAmmo.com, having its principal place of business at PO Box 66738, Saint Louis, MO 63166. BulkAmmo.com is engaged in the business of selling and distributing firearm ammunition that, on information and belief, began operations on or before June 28, 2012.

11.     Defendant Gold Strike E Commerce LLC, d/b/a/ Bullet Proof Body Armor HQ (hereinafter referred to as "BulletProofBodyArmorHQ.com") is an Arizona entity doing business at www.BulletProofBodyArmorHQ.com, having its principal place of business at 511 E. Colgate Drive, Tempe, AZ 85283. Bullet Proof Body Armor HQ is engaged in the business of selling and distributing body armor that, on information and belief, began operations on or before July 2, 2012.

12.     Defendant The Sportsman's Guide is a Minnesota entity doing business at www.sportsmansguide.com, headquartered at 411 Farwell Avenue, South St. Paul, MN 55075. The Sportsman's Guide is engaged in the business of selling and distributing firearm ammunition and accessories that, on information and belief, began operations on or before June 13, 2012.

13.     Defendant Brian Platt, d/b/a/ BTP Arms (hereinafter referred to as "BTP Arms") is a Maryland resident, whose business address is 7 Jay Gould CT., Unit 15, Waldorf, MD 20602. BTP Arms is engaged in the business of selling and distributing military grade tear gas that, on information and belief, began operations on or before May 10, 2012.

3

14.     John Doe Defendants are upon information and belief the owners and operators of the Defendant businesses named above.

15.     Defendant James Holmes is a natural person and citizen of the State of Colorado.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the claims in this case pursuant to Colo. Rev. Stat. § 13-1-124 because Defendants conducted business and committed tortious acts in the state.

17.     Venue is proper in this Court pursuant to C.R.C.P. 98, as it is a county where Defendants regularly conduct business and where Plaintiffs were injured.

## JAMES HOLMES' HISTORY OF PSYCHIATRIC PROBLEMS

18.     Available evidence indicates that in the months leading up to his assault at the Aurora theater, Holmes acted in a manner consistent with that of a dangerous, mentally unstable individual, which was apparent to those with whom he interacted.

19.     Indications of Holmes' dangerousness and mental instability include the following.

20.     From 2006 to 2010, Holmes went to the University of California, Riverside, where he received a bachelor's of science degree in neuroscience.[1] A student who lived across the hall from him "always thought he was a little strange. I could never put my finger on it, but something told me not to get too close to him."

21.     Holmes applied to graduate school shortly after graduating from the University of California. The University of Iowa rejected Holmes after his interview on January 28, 2011, according to the university's records. Two days after the interview, neuroscience program director Daniel Tranel sent an email to the admissions committee that read "James Holmes: Do NOT offer admission under any circumstances." A psychology professor who had also interviewed Holmes sent a separate email to the committee two days later to express his agreement with Tranel's recommendation. Holmes enrolled in the University of Colorado at Denver's graduate program in neurosciences in June 2011.

22.     As the second semester of the neuroscience program wound to a close, some students noticed that Holmes seemed more isolated and withdrawn. Upon information and belief, as early as March 2012 Holmes had conversations with a classmate indicating that he wanted to kill people and would do so when his life was over.

23.     Detective Tom Welton testified that sometime between April 19, 2012 and July 18, 2012, Holmes' Match.com dating profile read "Will you visit me in prison?" and featured a picture of him with orange hair. The same question also appeared on the AdultFriendFinder.com

---

[1] Melissa Pamer & Craig Fiegener, *UC Riverside Chancellor: "We Are Very Deeply Saddened" by Colorado Shootings*, http://www.nbclosangeles.com/news/local/UC-Riverside-Says-Student-Names-James-Holmes-Earned-Neuroscience-Degree-in-2010-163196356.html.

profile that Holmes created on July 5, 2012. On that profile, he also described himself as "a nice guy. Well, as nice enough of a guy who does these sorts of shenanigans."

24.     In late May or early June, the director of the movie "Suffocator of Sins," a dark Batman-like vigilante movie, was contacted by a man who identified himself as James Holmes from Denver. The caller stated that he had watched the trailer for the movie a hundred times and came off as "articulate, nervous, on the meek side." The director recalls that he was "obviously interested in the body count [of the movie]."

25.     Holmes met with at least three mental health professionals associated with the student mental health services at University of Colorado prior to July 20, 2012. One was a psychiatrist, Dr. Lynne Fenton. Dr. Fenton testified in the criminal action against Holmes that she only met with him once, on June 11, 2012.

26.     In the first ten days of June, before she even met with Holmes, Dr. Fenton notified other members of the University of Colorado Behavioral Evaluation and Threat Assessment (BETA) team that he could potentially be a danger to others. BETA contacted campus police for a background check on Holmes. However, the BETA team never convened to discuss the issue; following his poor performance on an oral exam on June 7, 2012, Holmes began the process of dropping out of school. Holmes officially dropped out of the program on June 10, 2012. His only appointment with Dr. Fenton took place on the following day.

27.     On June 12, 2012, Dr. Fenton contacted the University of Colorado police, alleging that Holmes was having homicidal thoughts and that he had threatened and harassed her via email and text messages. In response to Dr. Fenton's concerns, Police Officer Lynn Whitton deactivated Holmes' student ID, which prevented him from entering locked buildings on campus. Upon information and belief, Dr. Fenton rejected an offer by the university police to confine Holmes for 72 hours after he told her that he had fantasies about killing a lot of people.

28.     On June 25, 2012, Holmes applied to join a private gun range in Byers, Colorado. The owner of the Lead Valley Range called to invite him for an orientation and was put through to a "bizarre" voicemail message, which he later said he would have likened to something recorded by the Joker if he had seen the Batman movies. The owner described the voicemail answering message as "incoherent, just bizarre, really bizarre – slurring words, but he didn't sound drunk, just strange. . . ." After calling Holmes three times, the owner's attitude changed; he decided that he wanted to meet with Holmes before he would allow him into the range.

29.     Upon information and belief, Holmes communicated to others his concern that he had a mental illness. Two weeks before the shooting Holmes sent a text to a classmate asking whether she had heard about "dysphoric mania." In response to her question about whether the disorder was treatable, he replied that it was, but that she should stay away from him because he was "bad news." Dysphoric (or mixed) manias are described as mood episodes of a bipolar disorder in which an individual is simultaneously depressive and manic. Individuals experiencing mixed manias may exhibit dysphorically excited moods, irritability, anger, agitation, insomnia, grandiosity, and confusion.

30.     Hours before the shooting, Holmes took several pictures of himself wearing a black skull cap and black contacts. One of the photos showed Holmes holding a pistol below his face. Another showed some of the guns and gear he had recently purchased laid out on his bed. Just nine minutes before opening fire in the theater, Holmes tried to reach Dr. Fenton by calling an after-hours number for a University of Colorado hospital on the Anschutz campus. He was unable to reach her.

31.     According to a New York Times article published in August 2012, interviews with roughly a dozen people who had contact with Holmes in the months before the shooting "paint a disturbing portrait of a young man struggling with a severe mental illness who more than once hinted to others that he was losing his footing." A student said that in May, Holmes showed him a Glock semiautomatic that he said he bought for protection. Another student said that Holmes "always seemed to be off in his own world" and would "basically communicate with [her] in one-word sentences." The newspaper reported that many students would recall Holmes' behavior as "the pairing of a laconic ease with an almost crippling social discomfort."

32.     A faculty member who taught Holmes at the University of Colorado was not surprised to hear that Holmes was accused of the shooting. He described Holmes as being "strangely quiet in class" and "socially off."

33.     An employee at Nick's Liquors, a store in Holmes' Aurora neighborhood, got the feeling that Holmes was "a loner." A bouncer at a karaoke bar near Holmes' apartment remembered that Holmes would sit by himself in a corner booth, without talking to any of the bar's other patrons. A pharmacy student who lived in Holmes' building said that Holmes kept to himself and would not acknowledge people when he passed them in the hallway. Another neighbor described Holmes as "a recluse. He had no friends. He lost weight. His eyes didn't look right. No one knew him, no one knew him at all." On some nights neighbors were disturbed by loud music coming from his apartment, or a strange purple light in the windows. At other times, Holmes covered his windows in newspaper.

34.     Holmes was a drug user.

35.     After his arrest on July 20, 2012, Holmes admitted to detectives that he had taken 100 mg of Vicodin about two and a half hours before going on the shooting rampage.

36.     Investigators found bottles of clonazepam, a psychiatric drug, sedatives, and a bottle of sertraline, an anti-depressant, while searching his apartment.

37.     Holmes told a stranger at a Los Angeles nightclub that he enjoyed taking hallucinogenic drugs, such as LSD.

38.     In many instances, mass killers do not suddenly "snap" and commit horrific events. As in the case of Holmes, his crimes came at the end of a long road riddled with signs and hints of the perpetrator's mental disturbance.

39.     Defendants in this case knew, or should have known, that in his state of mental instability Holmes would present a danger to society if he were allowed to possess dangerous

materiel.  Nonetheless, Defendants negligently supplied and entrusted him with the materiel he used to launch his assault.

## DEFENDANTS' NEGLIGENT SALES OF AMMUNITION, TEAR GAS, BODY ARMOR, AND OTHER MATERIEL TO JAMES HOLMES

40.     On May 10, 2012, James Holmes purchased two 6oz. Clear Out Tear Gas Grenades from BTP Arms' website, www.KeepShooting.com. A single 6oz. grenade has the capacity to release a steady stream of tear gas for up to 75 seconds. These tear gas grenades, which contain "military grade" levels of Orthochlorobenzalmalononitrate and Oleoresin Capsicum, are advertised and designed to "incapacitate a large crowd," such as a crowded movie theater, and while they have law enforcement uses, they are not commonly purchased for self-defense, hunting or sport.

41.     On May 22, 2012, Holmes purchased a Glock 22 .40 caliber semi-automatic pistol from the Gander Mountain store in Aurora, Colorado.

42.     On May 28, 2012, Holmes purchased a Remington Model 870 Tactical 12 gauge shotgun, 50 rounds of 12 gauge shells, and 50 rounds of .40 caliber pistol cartridges at the Bass Pro Shops store in Denver, Colorado.

43.     On June 7, 2012, Holmes purchased a Smith & Wesson M&P 15 .223 caliber rifle, three Bushmaster AR-15/M16 30 round magazines, a black-padded shotgun sling, a neoprene rifle sling, a Safe Shot economy single gun case, and 100 rounds of .223 ammunition from the Gander Mountain's store in Thornton, Colorado.

44.     On June 13, 2012, Holmes purchased a 100 round drum magazine, 500 rounds of 12 gauge ammunition, 200 rounds of 12 gauge ammunition, hearing protection, and a laser sight from The Sportsman's Guide website, www.sportsmansguide.com.

45.     Separately on June 28, 2012, Holmes purchased at least 2050 rounds of .40 caliber ammunition, 2250 rounds of .223 caliber ammunition, and 25 rounds of 12 gauge shotgun shells from BulkAmmo.com.

46.     On July 1, 2012, Holmes bought a 12-gauge shotgun snap cap reload kit, 2 .223 snap caps, 5 .40 caliber magazines, and one scope with an AR mount from the Gander Mountain store in Aurora, Colorado.

47.     On July 2, 2012, Holmes purchased ballistic chaps online from International Armor Corporation.

48.     Separately on July 2, 2012, Holmes purchased a torso/neck protector, a bulletproof arm protector, a Kevlar groin protector and a cup groin protector online from Bullet Proof Body Armor's website. These items are not commonly used for hunting or self-defense. The website, www.bulletproofbodyarmorHQ.com, notes in small print at the bottom of the home page that it is illegal for anyone under the age of 18 or who is a convicted felon, has a criminal record, or is a fugitive from the law to purchase or possess bulletproof body armor and other ballistic items. The website warns that it "is the responsibility of the BUYER, to ascertain and

obey all applicable local, state or federal laws in regard to possession and use of any item from this on-line store." However, there is no mechanism by which to screen potential purchasers through a mandatory background check system to actually confirm their age and criminal history.

49.     Separately on July 2, 2012, Holmes purchased a Blackhawk Urban Assault Vest, a Blackhawk Triple pistol mag, a Blackhawk M16 Mag Pouch, and a Blackhawk knife online from TacticalGear.com.

50.     On July 6, 2012, Holmes purchased a Glock 23 .40 caliber pistol, a pack of targets, 200 rounds of .223 ammunition, four pounds of smokeless gun powder, a can of gun oil, and a gun cleaning kit from the Bass Pro Shops store in Denver, Colorado.

51.     For at least one of his online purchases, Holmes requested and received expedited shipping.

## HOLMES' PREPARATION

52.     On or around June 29, 2012, Holmes took photographs of the inside of the Aurora Century 16 movie theater with his iPhone Camera, including a close-up photograph of a door latch.

53.     On or around July 5, 2012, Holmes created a dating profile account on AdultFriendFinder.com. Holmes' dating profile contained a headline that read, "Will you visit me in prison?"

54.     On or around July 5, 2012, Holmes returned to the Aurora Century 16 movie theater and took more photographs, including a close-up image of the emergency exits and emergency flood lights.

55.     On or around July 7, 2012, Holmes purchased a movie ticket on Fandango.com for the July 20, 2012 midnight showing of *The Dark Knight Rises* at the Aurora Century 16 movie theater for Theater 8.

56.     On or around July 11, 2012, Holmes returned to the Aurora Century 16 movie theater and took more photographs of the emergency exit doors.

## THE SHOOTING

57.     On or around 5:17 pm on July 19, 2012, Holmes took photographs of his arsenal of weapons which he was able to obtain due to the Defendants' negligent and unreasonable business practices. These items include: a tactical vest, ballistic gear, rifle magazines, handgun magazines, a gas mask, a gas canister, a helmet, a rifle, a shotgun, and a handgun.

58.     On or around 6:22 pm on July 19, 2012, Holmes took another photograph of himself wearing a black skull cap and black contact lenses, making his eyes appear entirely dark.

59.     On or around 6:25 pm on July 19, 2012, Holmes took another photograph of himself, holding the muzzle end of a handgun near his face, pointing it towards the ceiling.

60.     On or around 6:31 pm on July 19, 2012, Holmes took a photograph of himself holding one of his homemade bombs.

61.     On or around midnight on July 20, 2012, Holmes is identified in surveillance footage entering the Aurora Century 16 movie theater.

62.     Holmes wore a black cap and dark pants.

63.     On or around 12:03 am on July 20, 2012, Holmes attempted to scan his phone in order to retrieve his movie ticket.

64.     After experiencing technical difficulties, Holmes handed his ticket over to the theater employee

65.     Before entering a theater, Holmes walked to the concession stand and stood there for several minutes, but did not purchase anything.

66.     The surveillance camera captured Holmes leaving the concession stand and walking towards Theater 9.

67.     On or around 12:20 am on July 20, 2012, a witness observed a man in a black cap, believed to be Holmes, leaving his seat in the front row to take a phone call.

68.     Holmes exited the theater through the front emergency exit and propped the emergency exit door open on his way out.

69.     Holmes retrieved his weapons before re-entering the theater.

70.     On or around 12:38 am on July 20, 2012, Holmes re-entered Theater 9 through the open emergency door exit.

71.     Aurora Police reported that Holmes was dressed in all black, wearing a ballistic helmet, bulletproof vest, leggings, a throat protector, a gas mask, and protective gloves.

72.     Approximately 15-20 minutes after the beginning of the movie, Holmes began his assault by throwing two canisters of tear gas into the audience.

73.     Movie-goers initially believed this to be part of the movie, or some kind of stunt associated with it.

74.     Equipped with a military-style semi-automatic rifle, a shotgun, and a pistol, Holmes began shooting at moviegoers in Theater 9, stopping only to reload.

75.     Aurora Police believe Holmes first used the shotgun, and then switched to the AR-15 rifle after his shotgun jammed, and then the Glock handgun to "re-engage his targets." A shotgun can be "devastating when fired at close range."

9

76.     Bullets from the attack tore through the theater walls and into Theater 8, causing injuries.

77.     Holmes continued shooting until his weapon jammed and the shooting stopped.

78.     When his weapon jammed, Holmes left the theater through the same emergency exit through which he had entered, and walked to his car.

79.     On or around 12:45 am on July 20, 2012, Holmes was identified by police and arrested in the parking lot behind the theater.

80.     At the time of his arrest, Holmes was wearing a gas mask and carrying a .223 caliber Smith & Wesson AR-15 assault rifle, equipped with a drum magazine, a Remington 12-gauge shotgun, and a .40-caliber Glock handgun.

81.     The .223-caliber Smith & Wesson AR-15 assault rifle was equipped with a drum magazine that could hold up to 100 rounds and shoot as many as 60 times in a minute.

82.     Officers later recovered a second .40-caliber Glock handgun from Holmes' vehicle.

83.     A second tear gas canister was found in an ammunition pouch in Holmes' vehicle.

84.     Holmes also carried thousands of rounds of ammunition.

85.     After the shooting, police recovered 209 live AR-15 rounds and 15 live 40-caliber handgun rounds.

86.     At the time of his arrest, Holmes told officers that his home contained explosives.

87.     On or around 2:00 am on July 20, 2012, officers investigated Holmes' apartment and found it contained incendiaries and small improvised explosive devices.

88.     Holmes' shooting spree killed 12 people and injured an additional 58 people.

89.     Holmes used the 100 round drum magazine, ammunition, body armor, and tear gas negligently supplied and entrusted to him by Defendants to kill and maim numerous people, including the following, for which he has been charged with 24 counts of first degree murder, two counts for each of the following victims: Jonathon Blunk; Alexander "AJ" Boik; Jesse Childress; Gordon Cowden; Jessica Ghawi; John Larimer; Matthew McQuinn; Micayla Medek; Veronica Moser-Sullivan; Alex Sullivan; Alexander Teves; and Rebecca Wingo.

90.     Holmes used the 100 round drum magazine, ammunition, body armor, and tear gas negligently supplied and entrusted to him by Defendants to kill and maim numerous people, including the following, for which he has been charged with 116 counts of attempted murder, two counts for each individual listed: Petra Anderson; Adan Avila; Jennifer Avila; Brandon Axelrod; Kaylin Bailey; Stephen Barton; Toni Billipando; Christina Blanche; Kelly Bowen; Jarrell Brooks; Maria Carbonell; Alejandra Cardona-Lamas; Shirley Clark; Corbin Dates;

Kirsten Davis; Louis Duran; Lauren Ellis; Craig Enlund; Alex Espinoza; Evan Farris; Jacqueline Fry; Yousef Gharbi; Zackary Golditch; Munirah Gravelley; Eugene Han; Gage Hankins; Hailee Hensley; Amanda Hernandez-Menije; Mckayla Hicks; Richelle Hill; Nathan Juranek; Jasmine Kennedy; Marcus Kizzar; Daybra Thomas Kizzar; Patricia Legarreta; Kelly Lewis; Brenton Lowak; Ryan Lumba; Caleb Medley; Katie Medley; Anggiat Mora; Evan Morrison; Ashley Moser; Stefan Moton; Victor Nava; Joshua Nowlan; Pierce O'Farrill; Prodeo Patria; Rita Paulina; Caitlin Peddicord; Bonnie Pourciau; Christopher Rapoza; Carli Richards; Ethan Rohrs; Jamie Rohrs; Dion Roseborough; Carey Rottman; Lucas Smith; Heather Snyder; Farrah Soudani; Catherine Streib; Jamison Toews; Denise Traynom-Axelrod; Marcus Weaver; Michael White; David Williams; Alleen Young; Jansen Young; and Samantha Yowler.

91.     These first degree murder and attempted murder counts include one for showing premeditation and one for showing extreme indifference to human life.

92.     The materiel negligently supplied and entrusted to Holmes by Defendants enabled, emboldened, facilitated, and caused him to kill and maim numerous people, including the following.

93.     Victim Jessica Ghawi was struck by six bullets, including one to the head, resulting in death.

94.     Victim Matthew McQuinn was struck by nine bullets, resulting in death.

95.     Victim Veronica Moser-Sullivan received gunshot wounds to her pelvis, wrist, knee, and abdomen, resulting in death.

96.     Petra Anderson was shot four times by Holmes, and at least once with a shotgun. She sustained a brain injury after being shot "square in her face."

97.     As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Adan Avila was shot three times in his right leg and left arm, resulting in the amputation of his right leg.

98.     As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Jennifer Avila sustained a gunshot wound to her head and minor injuries.

99.     As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Stephen Barton sustained a gunshot wound to his head. Barton also received shrapnel wounds in his chest and neck.

100.     As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Kaylin Bailey experienced chemical irritation. Her cousin, Veronica Moser-Sullivan, was shot and killed by Holmes in Theater 9.

101.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Toni Billipando was shot in the face and sustained dental injuries.

102.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Christina Blanche sustained gunshot wounds to her leg and fractured her leg. Blanche has a permanent limp now.

103.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Kelly Bowen sustained a gunshot wound to the right leg.

104.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Maria Carbonell sustained a gunshot wound to her right thigh, resulting in superficial injuries.

105.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Alejandra Cardona-Lamas sustained a gunshot wound to her right thigh.

106.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Shirley Clark suffered a minor head injury.

107.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Corbin Dates sustained a gunshot wound to his arm and minor injuries.

108.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Kirsten Davis sustained gunshot wounds to her back and buttocks.

109.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Louis Duran sustained gunshot wounds to his arm, chest and head.

110.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Lauren Ellis sustained a gunshot wound to her left shoulder, leaving pellets in her neck and back.

111.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Craig Enlund sustained a gunshot wound to his face, shoulder and arm.

112.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Alex Espinoza sustained a gunshot wound to his upper arm.

113.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Evan Farris sustained a fractured ankle.

114.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Jacqueline Fry sustained a gunshot wound to her right arm, thigh, and buttocks.

115.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Yousef Gharbi sustained gunshot wounds to his head and right arm. These gunshot wounds resulted in significant brain injury. Gharbi's doctors stated that he will always have some level of disability.

116.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Zackary Golditch sustained a gunshot wound to his neck.

117.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Munirah Gravelly sustained gunshot wounds to her head, arm, and hand. Victim Jesse Childress threw himself in front of Gravelley and saved her life.

118.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Eugene Han sustained gunshot wounds to his leg, hip and pelvis.

119.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Gage Hankins sustained a gunshot wound to his right arm.

120.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Hailee Hensley experienced chemical irritation.

121.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Amanda Hernandez-Menije sustained a minor head injury.

122.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Mckayla Hicks sustained gunshot wounds to her face, chin and jaw. Hicks required reconstructive surgery for her dental injuries.

123.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Richelle Hill experienced chemical irritation and minor head injuries.

124.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Nathan Juranek sustained gunshot wounds to his leg and calf.

125.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Jasmine Kennedy sustained a gunshot wound and fracture to her lower leg. Kennedy had to get a steel rod inserted in her leg.

126.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Marcus Kizzar sustained gunshot wounds to his legs and calf area.

127.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Daybra Thomas-Kizzar sustained gunshot wounds to her abdomen

128.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Patricia Legarreta sustained gunshot wounds to her lower leg and calf.

129.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Kelly Lewis experienced a chemical irritation.

130.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Brenton Lowak sustained gunshot wounds to his buttocks, hip and back.

131.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Ryan Lumba sustained gunshot wounds to his hip, abdomen, chest and arm and experienced extensive bleeding. Lumba nearly bled to death after taking a shotgun round to his chest.

132.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Caleb Medley sustained gunshot wounds to his face, right eye and head and experienced significant brain damage. Medley had to be put in a medically induced coma. His wife Katie, also injured in the shooting, gave birth to their son while Caleb was in the same hospital in critical condition.

133.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Katie Medley sustained a gunshot wound to the top of her head.

134.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Anggiat Mora sustained gunshot wounds to his face and neck.

135.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Evan Morrison sustained a dislocated knee.

136.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Ashley Moser sustained gunshot wounds to her chest and torso. The shooting paralyzed Moser and resulted in the miscarriage of her baby. Her six-year-old daughter, Veronica Moser-Sullivan, was shot and killed by Holmes in Theater 9.

137.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Stefan Moton sustained gunshot wounds to his shoulder and spinal injuries. The shooting paralyzed Moton from the waist down.

138.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Victor Nava sustained gunshot wounds to his hand and arm.

139.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Joshua Nowlan sustained gunshot wounds to his right arm, abdomen and leg. Nowlan has undergone significant medical treatment for his injuries, including surgeries, skin-grafting procedures and muscle replacements.

140.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Pierce O'Farrill sustained gunshot wounds to his arm and foot.

141.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Prodeo Patria sustained a gunshot wound to the lower back.

142.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Rita Paulina sustained gunshot wounds to her arm and leg.

143.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Caitlin Peddicord sustained an injury to her right knee. Her friend Alexander Teves was shot and killed by Holmes in Theater 9.

144.    As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Bonnie Pourciau sustained a gunshot wound to her left knee.

145.   As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Christopher Rapoza sustained a gunshot wound and minor injury.

146.   As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Carli Richards sustained gunshot wounds to her chest, back, and both arms and legs.

147.   As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Ethan Rohrs was dropped in the commotion and received bumps and bruises. Ethan Rohrs was 4 months old on July 20, 2012.

148.   As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Jamie Rohrs sustained wrist and ankle injuries.

149.   Holmes shot Dion Roseborough from five feet away. As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Roseborough sustained gunshot wounds to his shoulder. His injuries required extensive rehabilitation.

150.   As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Carey Rottman sustained a gunshot wound to the upper leg.

151.   As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Lucas Smith sustained a gunshot wound to his right pelvis and thigh.

152.   As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Heather Snyder sustained gunshot wounds to her right arm and hand and lost her finger.

153.   As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Farrah Soudani sustained a gunshot wound to her abdomen and was severely injured. It was reported that at the time of the shooting, her organs were "spilling out of her body."

154.   As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Catherine Streib sustained gunshot wounds in her lower back and buttocks.

155.   As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Jamison Toews sustained a minor gunshot wound to his head.

156.     As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Denise Traynom-Axelrod sustained gunshot wounds to her back and buttocks.

157.     As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Alleen Young sustained gunshot wounds to the chest and back.

158.     As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Marcus Weaver sustained gunshot wounds to his shoulder, elbow, and both legs and feet. One of his best friends, Rebecca Wingo, was shot and killed in Theater 9.

159.     As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Michael White sustained gunshot wounds to his torso and shoulder.

160.     As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, David Williams sustained gunshot wounds to his left hand and finger.

161.     As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Jansen Young sustained a gunshot wound to his torso.

162.     As a result of Holmes' shooting spree made possible by the 100 round drum magazine, ammunition, tear gas, and body armor that the Defendants negligently provided, Samantha Yowler sustained a gunshot wound to her knee. Her boyfriend, Matthew McQuinn, was shot and killed by Holmes in Theater 9.

## DEFENDANTS NEGLIGENTLY ENABLED, SUPPLIED AND ENTRUSTED HOLMES TO EQUIP HIMSELF WITH THE MEANS TO CONDUCT HIS MASS ASSAULT

163.     Plaintiff incorporates and re-alleges the above paragraphs as if stated fully here.

164.     In a single transaction, The Sportsman's Guide of St. Paul, Minnesota sold Holmes' hundreds of rounds of ammunition, as well as a 100 round drum magazine, hearing protection and a laser site.

165.     In a single transaction, BulkAmmo.com, which "was founded to provide serious shooters and training professionals" with ammunition, sold Holmes, a private citizen, thousands of rounds of ammunition.

166.     BulletProofBodyArmorHQ.com states on its website that "WE RESERVE THE RIGHT TO REFUSE SERVICE TO ANYONE," yet BulletProofBodyArmorHQ.Com, sold Holmes, a private citizen, four pieces of body armor.

167.     BTP Arms, sold Holmes two 6 oz. Clear Out Tear Gas grenades.

168.    Around or during the time that each Defendant sold Holmes the materiel, Holmes' behavior was so erratic that it raised the suspicions of the president of a local gun club. The club did not admit Holmes because of his bizarre behavior.

169.    Despite Holmes's alarming behavior, upon information and belief, the Defendants did not make reasonable inquiries into Holmes' purchases, nor did the Defendants take any extra precautions when selling Holmes weapons, accessories, and ammunition, or ask Holmes why he wanted the items.

170.    Federal law recognizes that bullet proof body armor is dangerous and therefore prohibits violent criminals from purchasing, possessing, or owning bullet proof body armor. 18 U.S.C. §931.

171.    Defendant BulletproofBodyArmorHQ.com nonetheless designed its websites so that prohibited purchasers could purchase bullet proof body armor without inquiry.

172.    The Defendants designed their websites in such a way that private purchasers could buy military and law enforcement grade accessories and mass quantities of ammunition without the input of any verifiable identification by buyers or sellers or without any mechanisms for identifying and distinguishing private buyers from military and law enforcement buyers.

173.    The Defendants' failure to design, operate and maintain a website that would have allowed them to make reasonable inquiries into mass purchases of ammunition, high capacity magazines, and tactical accessories posed an unreasonable risk of harm to others and proximately caused this criminal attack.

174.    The Defendants' conduct in creating, operating and maintaining websites which facilitated the sales of ammunition, high capacity magazines, body armor, and tear gas to unlawful purchasers created a foreseeable risk of injury or death and facilitated, enabled and caused this criminal attack.

175.    As a direct result of Defendant's negligent website design, operation and maintenance, 12 people were shot and killed and 58 others were injured.

## DEFENDANTS KNEW OF THE DANGERS THAT AMMUNITION, TEAR GAS, AND OTHER MATERIEL POSE WHEN POSSESSED BY DANGEROUS INDIVIDUALS

176.    Defendants knew or should have known that selling high capacity magazines, including 100 round drum magazines, tear gas, and substantial quantities of ammunition to a private citizen without inquiry poses an unreasonable risk of harm to others.

177.    Defendants knew or should have known that selling high capacity magazines, including 100 round drum magazines, tear gas, and substantial quantities of ammunition to persons who are dangerous because of mental illness poses a serious risk of death or injury to those persons and others.

178.    Defendant The Sportsman's Guide is a retail and online store that first operated in 1976.

179.    As an experienced ammunition seller, The Sportsman's Guide should have known that ammunition should not be supplied to persons who may pose a foreseeable risk of harm, including persons with dangerous mental illnesses such as Holmes.

180.    Defendant BulkAmmo.com has "many years of collective experience in supplying and using bulk ammunition."

181.    As an experienced ammunition and accessories seller, BulkAmmo.com should have known that ammunition should not be supplied to persons who may pose a foreseeable risk of harm, including persons with dangerous mental illnesses such as Holmes, and that vast quantities of ammunition can be used for mass shootings, such as the assault on the Aurora theater.

182.    Further, in the years leading up to Holmes' May-July 2012 purchases of multiple firearms, accessories, and ammunition, there were numerous highly-publicized incidents of individuals with mental illnesses using guns, accessories, large quantities of ammunition, and high capacity magazines to kill and injure innocent people.  These incidents should have put the Defendants on notice of the dangers of ammunition and other dangerous materiel in the hands of a severely mentally ill individual such as Holmes.

183.    On April 16, 2007, a lone gunman, Seung-Hui Cho, killed 33 people on Virginia Tech's campus, including himself, in one of the deadliest shootings in U.S. history.  In the aftermath of the Virginia Tech tragedy, many news outlets reported on Cho's mental illness, including the fact that Cho was briefly admitted into a psychiatric ward and had met with school counselors who labeled him as "troubled;" that two female students complained of his stalking behavior; and that a roommate had voiced concerns about Cho's suicidal intentions.  Although a Virginia court ruled that Cho was mentally ill, a danger to himself, and in need of psychiatric treatment, Cho was able to purchase multiple firearms including a .22 caliber Walther P22 and 9mm Glock 19 and over 150 rounds of ammunition prior to the shooting.

184.    On November 5, 2009, Major Nidal Hasan, an army psychiatrist, who evaluating supervisors described as "paranoid," "schizoid," and "mentally unstable," killed 13 people and wounded 32 others in the worst mass murder at a military base in U.S. history.  A few months prior, Hasan purchased an FN Herstal tactical pistol and a .357 Smith & Wesson from a Texas gun shop called Guns Galore.

185.    On January 8, 2011, Jared Lee Loughner shot 19 people, including U.S. Representative Gabrielle Giffords, and killed six others in Tucson, Arizona. He was diagnosed with paranoid schizophrenia and deemed incompetent to stand trial.  Loughner became erratic and delusional in the months leading up to the shooting, but was able to purchase the Glock 9mm handgun used in the shooting at a sporting goods store.

186.    On July 22, 2011, Anders Behring Breivik killed almost 70 people and wounded over 30 in a massacre on the Norwegian island of Utoya.  He used a 9mm Glock and a .223 caliber Ruger Mini-14 Rifle to kill or maim teenagers and young adults at a rival political party's youth camp.  He called 911 twice to surrender during the attacks, and while in custody he claimed that he deserved a medal of honor for his "necessary" killings.  One set of forensic

psychiatrists diagnosed Breivik with paranoid schizophrenia and deemed him psychotic at the time of the attacks.

187.    Federal law recognizes the dangers of selling firearms and ammunition to the dangerously mentally ill and controlled substance abusers, thus further putting defendants on notice. See 18 U.S.C. § 922(d)(1); §922(d)(3).

188.    Defendants knew or should have known that selling substantial quantities of ammunition, tear gas, and other materiel to persons who are dangerous because of illegal and legal drug use poses a serious risk of death or injury to those persons and others.

189.    Upon information and belief, James Holmes used illegal and legal drugs.

190.    The combination of (i) the highly-publicized preceding incidents of mass shootings perpetrated by the dangerous mentally ill; (ii) the federal and state laws recognizing the dangers of selling firearms to the dangerous mentally ill; (iv) the Defendant's knowledge of the risks posed by their products in the wrong hands and (v) common sense, lead to the undeniable conclusion that the Defendants knew or should have known that selling Holmes dangerous materiel would create a foreseeable risk of death or injury.

191.    Despite this knowledge of the foreseeable risk that certain individuals with severe mental illness will cause serious injury to themselves and/or others when given access to this materiel, the Defendants failed to make reasonable inquiries, and instead negligently employed unreasonably dangerous sales practices that supplied a dangerous person with the means to engage in a mass attack, thereby causing 12 people to die and many more to be injured.

192.    Defendants' conduct in disregarding these foreseeable risks was willful and wanton.

## CLASS ALLEGATIONS

193.    Plaintiffs bring the causes of action identified below on behalf of themselves and all other persons similarly situated pursuant to Colorado Rule of Civil Procedure 23.

194.    Plaintiffs bring this action on behalf of the following class:  All individuals wounded or killed in the attack on the Aurora Century 16 Theater in Aurora, Colorado on July 20, 2012 by James Holmes, or their next of kin or heirs.

195.    Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded or otherwise modified, and Plaintiffs reserve the right to establish sub-classes as appropriate.

196.    This action is brought and properly may be maintained as a class action under the provisions of Colorado Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3), and satisfies the requirements thereof.

197.    The Class is so numerous that joinder of all members is impractical, and the resolution of the claims through the procedure of a class action will be of benefit to the parties

and the Court.   The Class includes at least 70 people and may include as many as 85 based on survivors and next of kin.

198.   Questions of law and fact are common to the Class, and predominate over any questions which affect individual members of the Class, including without limitation:

a.   Whether Defendants owed Plaintiffs and members of the Class the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury, including by entrusting the means to engage in a mass assault to a dangerous, homicidal person.

b.   Whether Defendants owed Plaintiffs and members of the Class the duty to exercise reasonable care in selling dangerous goods and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.

c.   Whether Defendants breached these duties or otherwise fell below the applicable standard of care.

d.   Whether, by breaching these duties, Defendants caused or contributed to the damages incurred by Plaintiffs and members of the Class.

e.   Whether Plaintiffs and members of the Class sustained damages, and if so, the appropriate measure of damages.

f.   Whether Defendants knew or in the exercise of ordinary care should have known that Holmes intended or was likely to use their products in a way that would create an unreasonable risk of harm to others, including the Plaintiffs and members of the Class.

g.   Whether Defendants created an unreasonable interference with the rights held in common by the general public, constituting a public nuisance.

h.   Whether Defendants' actions caused, created, or maintained substantial and unreasonable interference with the public's health, safety, convenience, comfort, peace, and use of public property and/or private property.

199.   Plaintiffs' claims are typical of the claims of the Class, as all members of the Class were wounded or suffered the loss of a loved one in the attack on the Aurora Century 16 Theater in Aurora, Colorado on July 20, 2012 by James Holmes, as a result of Defendants' wrongful, negligent, and reckless conduct.

200.   Plaintiffs and all members of the Class have been similarly affected by Defendants' common course of conduct.

201.   Plaintiffs will fairly and adequately protect the interests of the class as there is no conflict between Named Plaintiffs and the other class members.

202.   Plaintiffs can adequately represent the interests of the class members and have retained counsel experienced in class action litigation.

203.   Furthermore, this matter is appropriate to proceed as a class action because prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

204.   In addition, this matter is appropriate to proceed as a class action because prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

205.   Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

206.   Should the Court not certify the Class, Plaintiffs' allegations can and will be maintained as a multi-plaintiff case.

## FIRST CAUSE OF ACTION

### (Negligent Entrustment - BulkAmmo.com)

207.   Plaintiffs incorporate and reallege the above paragraphs to the extent not inconsistent here.

208.   Defendant BulkAmmo.com was in control of the at least 2050 rounds of .40 caliber ammunition, 2250 rounds of .223 caliber ammunition, and 25 rounds of 12 gauge shotgun shells.

209.   Defendant BulkAmmo.com permitted Holmes, to use the ammunition.

210.   Defendant BulkAmmo.com either knew or in the exercise of ordinary care should have known that Holmes intended or was likely to use the ammunition in a way that would create an unreasonable risk of harm to others, including the plaintiffs herein.

211.   Defendant BulkAmmo.com's negligent entrustment of the ammunition to James Holmes directly and proximately caused permanent injuries and damages to the plaintiffs, including past and future pain, suffering, disability, and loss of enjoyment of life; past wage loss and impairment of future earning capacity; past and future medical expenses; and other compensable injuries and damages, all to their damage in an amount to be determined at a trial of this matter.

## SECOND CAUSE OF ACTION

### (Negligent Entrustment - The Sportsman's Guide)

212.     Plaintiffs incorporate and reallege the above paragraphs to the extent not inconsistent here.

213.     Defendant The Sportsman's Guide was initially in control of the 100 round drum magazine, 500 rounds of 12 gauge ammunition, 200 rounds of 12 gauge ammunition, hearing protection, and laser site.

214.     Defendant The Sportsman's Guide permitted Holmes, to use these products.

215.     Defendant The Sportsman's Guide either knew or in the exercise of ordinary care should have known that Holmes intended or was likely to use these products in a way that would create an unreasonable risk of harm to others, including the plaintiffs herein.

216.     Defendant The Sportsman's Guide's negligent entrustment of these products to James Holmes directly and proximately caused permanent injuries and damages to the plaintiffs, including past and future pain, suffering, disability, and loss of enjoyment of life; past wage loss and impairment of future earning capacity; past and future medical expenses; and other compensable injuries and damages, all to their damage in an amount to be determined at a trial of this matter.

### THIRD CAUSE OF ACTION

### (Negligent Entrustment - Bulletproofbodyarmorhq.com)

217.     Plaintiffs incorporate and reallege the above paragraphs to the extent not inconsistent here.

218.     Defendant BulletProofBodyArmorHQ.com was in control of the torso/neck protector, bulletproof arm protector, Kevlar groin protector, and cup groin protector.

219.     Defendant BulletProofBodyArmorHQ.com permitted Holmes, to use the items.

220.     Defendant BulletProofBodyArmorHQ.com either knew or in the exercise of ordinary care should have known that Holmes intended or was likely to use the body armor in a way that would create an unreasonable risk of harm to others, including the plaintiffs herein.

221.     Defendant BulletProofBodyArmorHQ.com's negligent entrustment of the ammunition to James Holmes directly and proximately caused permanent injuries and damages to the plaintiffs, including past and future pain, suffering, disability, and loss of enjoyment of life; past wage loss and impairment of future earning capacity; past and future medical expenses; and other compensable injuries and damages, all to their damage in an amount to be determined at a trial of this matter.

### FOURTH CAUSE OF ACTION

### (Negligent Entrustment - BTP Arms)

222.     Plaintiffs incorporate and reallege the above paragraphs to the extent not inconsistent here.

223.   Defendant BTP Arms was in control of the two 6 oz. Clear Out Tear Gas grenades.

224.   Defendant BTP Arms permitted Holmes to use the tear gas.

225.   Tear Gas is recognized as a "Riot Control Agent." Chemical Weapons Convention Implementation Act of 1998. 22 USC § 6701.  The use of tear gas for military purposes is internationally banned, and international law merely provides an exception for non-military law enforcement.

226.   James Holmes is a private civilian who had no legitimate use for tear gas.

227.   Defendant BTP Arms either knew or in the exercise of ordinary care should have known that Holmes intended or was likely to use the tear gas in a way that would create an unreasonable risk of harm to others, including the plaintiffs herein.

228.   Defendant BTP Arms's negligent entrustment of the tear gas to James Holmes directly and proximately caused permanent injuries and damages to the plaintiffs, including past and future pain, suffering, disability, and loss of enjoyment of life; past wage loss and impairment of future earning capacity; past and future medical expenses; and other compensable injuries and damages, all to their damage in an amount to be determined at a trial of this matter.


## FIFTH CAUSE OF ACTION

### (Negligence - The Sportsman's Guide,  BulkAmmo.Com, And BTP Arms)

229.   Plaintiffs incorporate and reallege the above paragraphs to the extent not inconsistent here.

230.   The Sportsman's Guide, BulkAmmo.com, and BTP Arms are vicariously liable for the actions or inactions of their agents and/or employees while in the scope of their agency and/or employment.

231.   At all relevant times, defendants The Sportsman's Guide, BulkAmmo.com, and BTP Arms were subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury.  Defendants The Sportsman's Guide, BulkAmmo.com, and BTP Arms had a duty to exercise reasonable care in selling their products and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.  Breach of this duty constitutes negligence, including negligent entrustment of the ammunition itself.

232.   The Sportsman's Guide, BulkAmmo.com, and BTP Arms knew or should have known their business practices were resulting in a substantial number of their products being purchased and used in crimes. The Sportsman's Guide, BulkAmmo.com, and BTP Arms also knew or should have known their business practices, and negligent website design were creating a foreseeable risk of injury to innocent victims such as the plaintiffs because their websites did not adequately screen for unlawful and dangerous purchasers. Practices leading to the increased

24

use of these products in crime creates a potential and unreasonable risk of injury to innocent parties such as the plaintiffs.

233.    The Sportsman's Guide, and BulkAmmo.com knew or had reason to know that Holmes was prohibited from possessing or receiving ammunition and as such that its sale of ammunition to him was illegal. Federal laws preclude selling ammunition to, among others, those who use or are addicted to unlawful drugs, including any person who unlawfully uses marijuana, depressants, stimulants, narcotic drugs, or other controlled substances. 18 U.S.C. § 922(d)(3). Upon information and belief, Holmes used unlawful drugs and abused other controlled substances.

234.    The Sportsman's Guide's sale of a 100 round drum magazine, 500 rounds of 12 gauge ammunition, 200 rounds of 12 gauge ammunition, hearing protection and a laser sight to Holmes was unlawful and negligent in several respects, including, but not limited to, the fact that Holmes purchased large quantities of ammunition; that there were other indicia that Holmes posed an unreasonable risk of harm to others, and that The Sportsman's Guide did not design its website to screen for unlawful purchasers.

235.    BulkAmmo.com's sale of 2050 rounds of .40 caliber ammunition, 2250 rounds of .223 caliber ammunition, and 25 rounds of 12 gauge shotgun sales to Holmes was unlawful and negligent in several respects, including, but not limited to, the fact that Holmes purchased large quantities of ammunition; that there were other indicia that Holmes posed an unreasonable risk of harm to others, and that BulkAmmo.com did not design its website to screen for unlawful purchasers.

236.    BTP Arm's sale of two 6 oz. cans of Clear Out Tear Gas Grenades to Holmes was unlawful and negligent in several respects, including, but not limited to, the fact that BTP Arms did not inquire as to why a civilian might want or need to purchase tear gas; that there were other indicia that Holmes posed an unreasonable risk of harm to others, and that BTP Arms did not design its website to screen for unlawful and dangerous purchasers.

237.    The Sportsman's Guide, BulkAmmo.com, and BTP Arms were also negligent in designing their websites to screen and determine whether it was reasonable to sell the prospective purchaser ammunition or tear gas.

238.    The circumstances of the purchases mentioned above, including the large quantities of ammunition and high capacity magazines, including 100 round drum magazines, and the sale of two tear gas grenades to a private citizen would inform a reasonable business that Holmes had illegal or unreasonable intent. A reasonable business would have known that Holmes intended to unlawfully use these products.

239.    The Sportsman's Guide, BulkAmmo.com, and BTP Arms foreseeably knew or should have known, that innocent persons such as the plaintiffs herein would be injured as a result.

240.    The negligence of The Sportsman's Guide, BulkAmmo.com, and BTP Arms as alleged, directly and proximately caused permanent injuries and damages to the plaintiffs, including past and future pain, suffering, disability, and loss of enjoyment of life; past wage loss

and impairment of future earning capacity; past and future medical expenses; and other compensable injuries and damages, all to their damage in an amount to be determined at a trial of this matter.

## SIXTH CAUSE OF ACTION

### (Negligence - BulletProofBodyArmorHQ.com)

241.   Plaintiffs incorporate and reallege the above paragraphs to the extent not inconsistent here.

242.   BulletProofBodyArmorHQ.com is vicariously liable for the actions or inactions of its agents and/or employees while in the scope of their agency and/or employment.

243.   At all relevant times, defendant BulletProofBodyArmorHQ.com was subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury.  Defendant BulletProofBodyArmorHQ.com had a duty to exercise reasonable care in selling bullet proof body armor and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.  Breach of this duty constitutes negligence, including negligent entrustment of the body armor itself.

244.   BulletProofBodyArmorHQ.com also knew or should have known its business practices, and poor website design were creating a foreseeable risk of injury to innocent victims such as the plaintiffs because its website did not adequately screen for unlawful bullet proof body armor purchasers.

245.   BulletProofBodyArmorHQ.com's sale of a torso/neck protector, bulletproof arm protector, Kevlar groin protector and cup groin protector to Holmes was unlawful and negligent in several respects, including, but not limited to, the fact that Holmes, a private citizen, purchased large quantities of bullet proof body armor; that there were other indicia that Holmes posed an unreasonable risk of harm to others, and that BulletProofBodyArmorHQ.com did not design its website to screen for unlawful purchasers.

246.   The circumstances of the purchases mentioned above, including the sale of bullet proof body armor to a private citizen inform a reasonable seller that Holmes had illegal or unreasonable intent.  A reasonable seller would have known that Holmes intended to unlawfully use the body armor.

247.   BulletProofBodyArmorHQ.com foreseeably knew or should have known, that innocent persons such as the plaintiffs herein would be injured as a result.

248.   The negligence of BulletProofBodyArmorHQ.com as alleged, directly and proximately caused permanent injuries and damages to the plaintiffs, including past and future pain, suffering, disability, and loss of enjoyment of life; past wage loss and impairment of future earning capacity; past and future medical expenses; and other compensable injuries and damages, all to their damage in an amount to be determined at a trial of this matter.

## SEVENTH CAUSE OF ACTION

### (Public Nuisance - All Defendants)

249.    Plaintiffs incorporate and reallege the above paragraphs to the extent not inconsistent here.

250.    By negligently, recklessly, and/or intentionally selling large quantities of ammunition, high capacity magazines, including 100 round drum magazines, tear gas, and other materiel in a manner that ensures a steady flow of dangerous materiel in large quantities to persons with criminal purposes, Defendants have negligently and/or knowingly violated Colorado law thereby participating in creating and maintaining an unreasonable interference with the rights held in common by the general public, constituting a public nuisance under Colorado law.  Without limitation, the acts and omissions of the Defendants as alleged herein caused, created, and maintains substantial and unreasonable interference with the public's health, safety, convenience, comfort, peace, and use of public property and/or private property, including by contributing to and causing the mass attack at the Aurora movie theater.

251.    The acts and omissions of Defendants as alleged herein substantially and unreasonably interfere with the public's use of public facilities, including the use of public highways and walkways.  Public highways and walkways are substantially and unreasonably unsafe because of the presence of materiel negligently supplied by Defendants.  Defendants' acts and omissions as alleged herein substantially and unreasonably (a) increase the number of criminal attacks in and on public facilities, including on public highways and walkways, and (b) increase the degree to which unlawful possessors in and on public facilities, including on highways and walkways, are illegally armed with weapons.

252.    Defendants' actions in negligently, recklessly, and/or intentionally providing ammunition and other materiel to persons with criminal purposes constitute an ongoing and substantial threat to public safety and welfare because such materiel is used in crimes where they continue to cause harm to innocent victims such as the plaintiffs.

253.    Numerous members of the public have been killed, injured, or involved in criminal acts as a result of materiel negligently sold and entrusted by the Defendants, and Defendants' risk-producing conduct and the deaths and injuries that result from it continue.  Defendants' acts and omissions as alleged herein cause a substantial and unreasonable increase in the number of members of the general public who are killed and injured.

254.    Defendants' acts and omissions as alleged herein cause substantial and unreasonable interferences with the public's health, safety, convenience, comfort, and peace in numerous other ways, including: (a) facilitating the sale of ammunition, tear gas, and other materiel to dangerous persons who commit violent crimes against innocent members of the general public; (b) increasing the number and severity of crimes committed against innocent members of the general public by supplying large amounts of ammunition, tear gas, and other materiel to purchasers; and (c) increasing the number and severity of incidents in which those in possession of ammunition, tear gas, and other materiel.

255.    The Defendants know or have reason to know that the acts and omissions alleged herein caused substantial and unreasonable interferences with the public's health, safety, convenience, comfort, peace, and use of public facilities.  The Defendants' acts and omissions as alleged herein were undertaken with negligent and/or intentional disregard of the rights of the general public.  Defendants knew that they could have taken precautions that would have eliminated or minimized the injuries to the general public but they chose not to take those precautions in order to maximize their revenues and profits.

256.    The Defendants' interference with the public's health, safety, convenience, comfort, peace, and use of public facilities is unreasonable, unlawful, substantial, significant, continuing, and long-lasting.  This interference is not insubstantial or fleeting, and involves deaths and serious injuries suffered by many people and a severe disruption of public peace, order, and safety.

257.    The Defendants' negligence and unlawful conduct is a cause of the public nuisance.

258.    Defendants knowingly violated Colorado's public nuisance statute.  Colorado's public nuisance statute is applicable to the sale and marketing of firearms that cause harm to the public.  Defendants' violation of Colorado's public nuisance statute was a proximate cause of the plaintiffs' harm.

259.    The Defendants' unlawful, negligent and/or intentional creation or maintenance of the public nuisance directly and proximately caused significant harm, including permanent injuries and damages to the plaintiffs that is different from the harm suffered by other members of the public, including past and future pain, suffering, disability, and loss of enjoyment of life; past wage loss and impairment of future earning capacity; past and future medical expenses; and other compensable injuries and damages, all to their damage in an amount to be determined at a trial of this matter.

## EIGHTH CAUSE OF ACTION

### (Assault And Battery, Assault With A Deadly Weapon, Murder, And Negligence - James Holmes)

260.    Plaintiffs incorporate and reallege the above paragraphs to the extent not inconsistent here.

261.    Defendant James Holmes had the unlawful intent, and present ability, to do physical harm to the Plaintiffs.

262.    Defendant James Holmes made menacing physical movements toward the Plaintiffs that were close enough to the Plaintiffs to justify a reasonable fear of physical harm.

263.    Through the actions of the Defendant James Holmes, the Plaintiffs were put in fear, had reasonable cause to believe, and did believe, that the Defendant James Holmes had a present ability to cause immediate and harmful bodily contact and/or physical harm to them and did intend to cause physical harm to them.

264.    Defendant James Holmes had an intent to cause the Plaintiffs harm or the intent to put the Plaintiffs in fear that physical harm was to be committed upon them.

265.    No Plaintiffs consented to being assaulted by James Holmes.

266.    Defendant James Holmes intentionally caused bodily harm and death to the Plaintiffs by shooting them repeatedly in an attack made possible by materiel provided by the other named Defendants.

267.    No Plaintiffs consented to being battered or shot by James Holmes.

268.    Defendant James Holmes' assault and battery on the Plaintiffs directly and proximately caused permanent injuries and damages to the Plaintiffs, including past and future pain, suffering, disability, and loss of enjoyment of life; past wage loss and impairment of future earning capacity; past and future medical expenses; and other compensable injuries and damages, all to their damage in an amount to be determined at a trial of this matter.

**WHEREFORE**, the Plaintiffs respectfully seek judgment as follows:

a.      For compensatory damages in an amount to be determined at a trial of this matter;

b.      For compensatory damages in an amount to be determined at a trial of this matter;

c.      For punitive damages in an amount to be determined at a trial of this matter;

e.      For an order enjoining or abating the public nuisance;

f.      For any and all equitable relief that may be justified;

g.      For all costs, disbursements and actual attorney's fees, and all interest due and owing; and

h.      For such other and further relief as this Court may deem appropriate.

**PLEASE TAKE NOTICE THAT PLAINTIFFS DEMAND A TRIAL BY A TWELVE PERSON JURY IN THIS ACTION.**

Plaintiffs' Address:
2906 Whisper View,
San Antonio, TX 78230

29

Dated:  July 18, 2014

Respectfully submitted,
**ARNOLD & PORTER LLP**

By: /s/ Paul W. Rodney_____